# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBYN SLACK**, <br><br> Plaintiff, <br><br> v. <br><br> **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY** *et al.*, <br><br> Defendants. | Case No. 1:16-cv-00130 (TNM) |

## MEMORANDUM OPINION

Plaintiff Robyn Slack lost her job at Washington Metropolitan Area Transit Authority ("WMATA") after refusing to act as the sole point of contact for a procurement contract, which she claimed would have violated the law. She sued WMATA for unlawful retaliation and her supervisor, Judy Mewborn, for defamation. The Court dismissed Ms. Slack's retaliation claims under the False Claims Act and the District of Columbia Protection Act because sovereign immunity barred those claims. *See Slack v. Wash. Metro. Area Transit Auth.*, 325 F. Supp. 3d 146, 150–51 (D.D.C. 2018) ("*Slack I*"). WMATA now moves for summary judgment on the remaining claims, and Ms. Slack opposes. WMATA's motion will be denied as to Ms. Slack's retaliation claim under the American Recovery and Reinvestment Act ("ARRA"), but sovereign immunity bars her retaliation claim under the National Defense Authorization Act ("NDAA"). Because Ms. Mewborn enjoys immunity from Ms. Slack's defamation claim, Ms. Mewborn's motion for summary judgment will be granted as to that claim.

## I. BACKGROUND

Ms. Slack was a Capital Analyst in WMATA's Office of Systems Maintenance. Slack Dep. at 58, ECF No. 51-2. In this position, Ms. Slack provided oversight management for budgets and projects in WMATA's Capital Improvement Program ("CIP"). *See* "Job Description for Capital Program Analyst," ECF No. 51-7. Ms. Mewborn was her direct supervisor. Slack Dep. at 60.

Ms. Mewborn oversaw "CIP 0027," a project aimed at improving the safety and reliability of interlocking track structures and replacement of switch machines. Olumid Dep. at 8, ECF No. 52-4. Ms. Mewborn proposed that Ms. Slack would be the contact person for "all orders being requested that are related to CIP 0027." July 1, 2014 Email, ECF No. 51-8. Ms. Slack claims that she told Ms. Mewborn in a meeting that such a plan would violate WMATA's legal and regulatory obligations to maintain "internal controls." Slack Dep. at 81–83.

A few months later, Ms. Mewborn issued Ms. Slack a written warning about her job performance. *See* "Poor Performance and Conduct – Written Warning," ECF No. 51-9. In her warning, Ms. Mewborn criticized Ms. Slack for, among other things, using confidential information about her co-worker's salary to request her own promotion. *Id.* After Ms. Slack objected to the written warning, a WMATA employee relations officer investigated and concluded that it was unclear whether Ms. Slack had used confidential information to learn her co-worker's salary. Jones-Ogunsuy Dep. at 28–29, ECF No. 51-4. So Ms. Mewborn issued Ms. Slack a revised memorandum without reference to Ms. Slack's alleged use of confidential information. "Unsatisfactory Performance," ECF No. 51-11. This memorandum included several other concerns: (1) inability to meet department expectations; (2) failure to meet deadlines and unable to work in a fast-paced, high stress environment; (3) failure to follow up

and provide requested information; and (4) failure to follow clear instructions. *Id.* Six weeks later, WMATA fired Ms. Slack. "Termination of Employment" Memorandum, ECF No. 51-12.

Ms. Slack sued WMATA for unlawful retaliation and Ms. Mewborn for defamation. *Slack I*, 325 F. Supp. 3d at 150. WMATA moved to dismiss Ms. Slack's retaliation claims under the False Claims Act and the District of Columbia Whistleblower Protection Act, and the Court dismissed these claims based on WMATA's sovereign immunity. *Id.* at 151. WMATA and Ms. Mewborn ("Defendants") have now moved for summary judgment on the remaining claims, and Ms. Slack opposes.

## II.   LEGAL STANDARDS

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute is material if it could alter the outcome of the suit under the substantive governing law. *Id.* at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant makes this showing, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

3

As the Court explained in *Slack I*, the Eleventh Amendment generally prohibits a federal court from exercising jurisdiction over claims against a state. 325 F. Supp. 3d at 151; U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). As Ms. Slack appears to concede, when Virginia, Maryland, and the District of Columbia created WMATA, they conferred their sovereign immunity upon it. *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 219–20 (D.C. Cir. 1986).

"[T]he question whether Eleventh Amendment immunity is a matter of subject matter jurisdiction is an open one." *U.S. ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 892 (D.C. Cir. 1999). On the one hand, courts do not have to consider sovereign immunity *sua sponte*: "[u]nless the State raises the matter, a court can ignore it." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). But parties also can raise sovereign immunity for the first time on appeal. *See SCS Bus. & Tech. Inst.*, 173 F.3d at 892. As the D.C. Circuit has explained, "[t]he Eleventh Amendment bar on suits against states in federal court is not a garden variety jurisdictional issue." *Id.*

To keep on the right track, the Court will undertake its own jurisdictional analysis—assisted but not limited by the parties' arguments[1]—and ask whether sovereign immunity bars each of Ms. Slack's claims.[2] As the Court has explained, there are two primary exceptions to

---

[1] In her briefing, Ms. Slack asserts that WMATA has "waived" specific sovereign immunity arguments. Because WMATA can raise sovereign immunity at any time, the Court will not limit itself to WMATA's arguments.

[2] A federal court must satisfy itself that it has jurisdiction over a claim before proceeding to the merits and must dismiss any action over which it determines that it lacks subject matter jurisdiction. *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

4

sovereign immunity: (1) Congress may limit sovereign immunity if it unequivocally expresses its intent to abrogate that immunity; or (2) an entity may voluntarily waive its immunity by making a clear declaration that it will submit to a federal court's jurisdiction.[3] *See Slack I*, 325 F. Supp. 3d at 151.

### III. ANALYSIS

#### A. WMATA is Not Entitled to Summary Judgment on Ms. Slack's Retaliation Claim under the ARRA.

The American Recovery and Reinvestment Act of 2009, "popularly known as the Stimulus Act, was passed as an emergency legislation to rescue the American economy from deep recession." *Dorsey v. Jacobson Holman PLLC*, 707 F. Supp. 2d 21, 23 (D.D.C. 2010). To safeguard federal funds and encourage transparency, the ARRA includes whistleblower protections for employees of non-Federal employers receiving funds under the ARRA. *See* ARRA, Pub. L. No. 111–5, § 1553 (2009).

As Ms. Slack concedes, Congress did not abrogate WMATA's sovereign immunity under the ARRA. *See* Opp. to Defs.' Mot. for Summ. Jdgt. ("Opp.") at 13–18, ECF No. 52 (only arguing that WMATA waived its immunity as to her ARRA claim). The textual provisions must "demonstrate with unmistakable clarity that Congress intended to abrogate the States' immunity

---

[3] Ms. Slack originally filed this case in the Superior Court of the District of Columbia, and WMATA removed it to federal court. Once in federal court, Ms. Slack amended her complaint to add her ARRA and NDAA claims. Ms. Slack has never argued that WMATA waived its immunity by removing this case to federal court. "Unlike the defense of sovereign immunity, which is jurisdictional and may be raised at any time, the claim that WMATA waived its immunity is an argument that must be raised in a timely fashion." *Watters v. Wash. Metro. Area Transit Auth.,* 295 F.3d 36, 42 n.13 (D.C. Cir. 2002). So the Court will not consider whether WMATA waived sovereign immunity by removing this case.

from suit." *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989). The ARRA does not do so. For instance, the language of the ARRA does not even mention the Eleventh Amendment or state sovereign immunity. *See id.* And the Supreme Court has made clear that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.*

But Ms. Slack insists that WMATA has waived its sovereign immunity. For the Court to find waiver, WMATA must make a "clear declaration" of its intent to submit to federal court jurisdiction. *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1163 (D.C. Cir. 2004). This is a high bar. *Id.* To elicit such a clear declaration, Congress "may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Congress must exercise its power explicitly: a congressional waiver provision is constitutional only if it manifests "a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Barbour*, 374 F.3d at 1163 (citation omitted).

For instance, in *Barbour*, the D.C. Circuit determined that the Civil Rights Remedies Equalization Act ("CRREA") unambiguously conditioned a state agency's acceptance of federal funds on its waiver of its Eleventh Amendment immunity when it provided:

> A state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

6

*See Barbour*, 374 F.3d at 1164 (quoting 42 U.S.C. § 2000d-7(a)(1)). That statutory language elucidates "the simple choice offered:" accept funding and waive immunity from suit or decline funding and retain sovereign immunity. *Id.*

"[T]he mere receipt of federal funds does not establish that a state has consented to suit in federal court." *Duncan v. Wash. Metro. Area Transit Auth.*, 214 F.R.D. 43, 46 (D.D.C. 2003). The ARRA does not condition WMATA's acceptance of funds on its waiver of its sovereign immunity.[4] True, ARRA's whistleblower protections purport to apply to employees of non-Federal employers: the ARRA specifies that the term "non-Federal employer" includes "State or local government receiving funds." ARRA, § 1553(g)(4). But Congress did not expressly condition receipt of ARRA funds *on* waiver of sovereign immunity. Ms. Slack points to nothing in the ARRA that presents WMATA with a clear choice: accept funds and lose its sovereign immunity or decline funds and remain free of ARRA whistleblower suits. By contrast, consider the CRREA, which clearly states that "recipients of Federal financial assistance" "shall not be immune under the Eleventh Amendment." 42 U.S.C. § 2000d-7(a)(1).

Even though Congress did not condition receipt of ARRA funds on WMATA's waiver, the Court finds that WMATA has waived its sovereign immunity here for ARRA whistleblower lawsuits. What Congress does not demand, a State may nonetheless voluntarily relinquish. The Court will find waiver if an entity "makes a 'clear

---

[4] In its reply brief, WMATA argues that the ARRA is unconstitutionally coercive given the amount of ARRA funds that it receives from Congress. Defs.' Reply to Pl.'s Opp., ECF No. 53, 4. Courts seldom consider new arguments first raised in reply briefs. *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015). In any event, because the Court finds that Congress did not condition receipt of ARRA funds on WMATA's waiver, WMATA's argument about the ARRA's coercive effect is meritless.

7

declaration' of its intent to submit to federal court jurisdiction." *Barbour*, 374 F.3d at 1163 (quoting *College Sav. Bank,* 527 U.S. at 676). Courts "indulge every reasonable presumption against waiver." *College Sav. Bank*, 527 U.S. at 682. Even so, the Court finds that WMATA has waived its immunity through its course of conduct.

The ARRA states that (1) its whistleblower protections apply to States; and (2) whistleblower complainants may file actions in federal court. *See* ARRA §§ 1553(g)(4) and (c)(3). WMATA's own "Policy on Whistleblower Rights and Responsibilities" notifies employees that they "may file a complaint of discrimination with the Inspector General of the appropriate federal agency" under specifically the ARRA. *See* "Board Resolution and Whistleblower Policies" at 6, ECF No. 52-13. While this policy does not expressly say that WMATA is willing to subject itself to a lawsuit in federal court, this is evidence that WMATA expected to be subject to whistleblower lawsuits. And in its Master Agreement with the Federal Transit Administration, WMATA affirmatively "agree[d] to comply with the requirements" of the ARRA. "Master Agreement" at 77–78, ECF No. 52-8. Given ARRA's statutory provisions—which include relief in federal court against States—when WMATA affirmatively agreed to comply with the ARRA, accepted federal funds under the ARRA, and advertised the ARRA's whistleblower protections to its employees, WMATA waived its immunity from these lawsuits.

Still WMATA insists that Ms. Slack cannot prevail on her ARRA claim because there is no evidence that her whistleblowing disclosures related to ARRA funds. Defs.' Mot. for Summ. Jdgt. ("Defs.' Mot.") at 9–11, ECF No. 51. Ms. Slack alleges that WMATA terminated her in retaliation for voicing concerns about CIP 0027, and WMATA insists that CIP 0027 was not funded by ARRA "covered funds." *Id.* at 10.

Ms. Slack claims that any uncertainty about the source of the funds used to finance CIP 0027 should be held against WMATA because of WMATA's own "inability to keep track of its funds." Opp. at 23.

To show that WMATA did not use ARRA funds on CIP 0027, WMATA points to an affidavit from its Managing Director of the Office Management and Budget Services, Yetunde Olumide. Defs.' Mot. at 2. In her affidavit, Ms. Olumide says that "CIP 0027 did not receive any funding provided by the American Recovery and Reinvestment Act of 2009." Olumide Aff. at 1, ECF No. 51-6. But as Ms. Slack points out, Ms. Olumide is more equivocal in her deposition about the source of CIP 0027 funds. Olumid Dep. at 25–26. Ms. Olumide admits that WMATA staff had "gone through and . . . scrubbed and cleaned out aligned transactions accordingly" to ensure that the database was accurate to prepare for litigation. *Id.* at 25. When asked about WMATA's difficulties tracking financial transactions, Ms. Olumide admitted that "there were a lot of transactions that were not well tracked" but insisted that she "believe[d] that the information that was provided to me concerning the back-up for the CIP27, were – accurate as far as [she] knew]." *Id.* at 25–26.

And in her affidavit, Ms. Olumide claims that there were three funding sources for the CIP 0027 project: (1) Federal Formula Grants; (2) Passenger Rail Investment and Improvement Act Grants; and (3) non-federal funding from local governments, including Maryland, Virginia, and the District of Columbia. Olumide Aff. at 1. WMATA's own records track these categories. *See* "CIP 0027 Funding Sources," ECF No. 52-19. But these same records also admit uncertainty. In the category of "Non-Federal Funding," these records suggest that the CIP 0027 was funded from "DEBT." *Id.* WMATA does

9

not explain what "DEBT" means. At trial, WMATA may be able to prove that CIP 0027 was not funded by ARRA funds, but to prevail on summary judgment, WMATA must show that there is no genuine issue as to the source of these funds. *See Celotex Corp.*, 477 U.S. at 323. WMATA has not done so, therefore Ms. Slack's ARRA claim survives.

### B. WMATA's Sovereign Immunity Bars Ms. Slack's Retaliation Claim under the NDAA.

Ms. Slack's retaliation claim under the NDAA may proceed only if sovereign immunity does not bar her claim. Again, the Court asks whether: (1) Congress has unequivocally expressed its intent to abrogate WMATA's sovereign immunity or (2) WMATA has voluntarily waived its immunity by making a clear declaration that it will submit to a federal court's jurisdiction. *See Slack I*, 325 F. Supp. 3d at 151.

The NDAA's whistleblower retaliation provision provides:

> An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1).

Ms. Slack admits that Congress did not abrogate WMATA's sovereign immunity under the NDAA or even explicitly condition receipt of federal funds on WMATA's waiver of its immunity. Opp. at 18. Instead, Ms. Slack argues that the Secretary of

Transportation conditioned the receipt of funds on such a waiver through its regulations. *Id.* Specifically, she points to 2 C.F.R. § 200.300(b):

> The non–Federal entity is responsible for complying with all requirements of the Federal award. For all Federal awards, this includes the provisions of FFATA, which includes requirements on executive compensation, and also requirements implementing the Act for the non–Federal entity at 2 CFR part 25 Financial Assistance Use of Universal Identifier and System for Award Management and 2 CFR part 170 Reporting Subaward and Executive Compensation Information. See also statutory requirements for whistleblower protections at 10 U.S.C. 2409, *41 U.S.C. 4712*, and 10 U.S.C. 2324, 41 U.S.C. 4304 and 4310.

2 C.F.R. § 200.300(b) (emphasis added). Ms. Slack argues that because this regulation requires non-Federal entities, presumably such as WMATA, to comply "with all requirements of the Federal award" and references NDAA's whistleblower protection— 41 U.S.C. § 4712—WMATA waived its sovereign immunity when it accepted federal funds. Opp. at 20.

Ms. Slack insists that it "makes no difference" that the Secretary of Transportation—not Congress—attached the conditions to federal funding recipients. Opp. at 18. Not so. To be sure, "Congress may attach conditions on the receipt of federal funds . . . [such as] compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted). That is, Congress can condition receipt of federal funds on a state waiving its sovereign immunity and complying with "administrative directives," such as Department of Transportation regulations. The problem here is that *Congress* has not conditioned receipt of federal funds on WMATA's waiver of sovereign immunity. The Secretary did.

Ms. Slack cites *Association of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427 (D.C. Cir. 2013), to argue that the Secretary of Transportation may condition receipt of federal funds on WMATA's waiver of its sovereign immunity. Title

11

IV of the Higher Education Act ("HEA") of 1965 created student-loan programs, which the Department of Education administers. *Id.* at 433. As the D.C. Circuit explained, "[t]o participate in Title IV programs—*i.e.*, to be able to accept federal funds—a postsecondary institution . . . must satisfy several statutory requirements." *Id.* For example, the statute requires federal-funding-seeking institutions to comply with regulations about fiscal eligibility, issued by the Secretary of Education. *See* 20 U.S.C. § 1094. In rejecting plaintiffs' challenge to a specific regulation, the D.C. Circuit emphasized that "the regulations merely establish criteria for schools that choose to participate in federal programs." *Duncan*, 681 F.3d at 458. That is, the regulations apply only to schools that "choose to participate" in this federal program.

Unlike the NDAA, the HEA is clear that Congress conditioned the receipt of federal funding on the institutions complying with both statutory and regulatory requirements. *See* 20 U.S.C. § 1094 ("In order to be an eligible institution for the purposes of any program authorized under this subchapter, an institution . . . shall enter into a program participation with the Secretary. The agreement shall condition . . . eligibility . . . upon compliance with the following requirements . . . ."). *Duncan* does not hold that a regulation alone can condition receipt of federal funds on a waiver of sovereign immunity. Rather, *Duncan* shows that Congress can condition receipt of federal funds on compliance with statutes and regulations.

And even if the Secretary of Transportation—not Congress—could condition receipt of federal funds on an entity's waiver of its sovereign immunity, this regulation does not do so. Section 200.300(b) instructs non-Federal entities to comply with "all requirements of the Federal award." 2 C.F.R. § 200.300(b). Then it instructs readers to

consult "statutory requirements for whistleblower protections" including the NDAA's protections. *Id.* It does not suggest that receipt of federal funding is conditioned on compliance with these federal regulations; there is no conditional language. And the regulation does not reference sovereign immunity or the Eleventh Amendment. For example, it does not declare that non-Federal entities "shall not be immune under the Eleventh Amendment of the Constitution of the United States" from suits under 42 U.S.C. § 4712. *Cf.* 42 U.S.C. § 2000d-7(a)(1).

Because Congress did not abrogate WMATA's sovereign immunity and because WMATA did not waive its immunity under the NDAA, this Court lacks jurisdiction over Ms. Slack's NDAA claim.[5]

### C. Ms. Mewborn is Entitled to Summary Judgment on Ms. Slack's Defamation Claim.

Ms. Mewborn claims she is entitled to summary judgment on Ms. Slack's defamation claim. She argues that she has absolute immunity from Ms. Slack's defamation action because she was acting in her official capacity as a WMATA supervisor and the conduct at issue was discretionary. Defs.' Mot. at 14–18. In response, Ms. Slack does not dispute Ms. Mewborn's

---

[5] Ms. Slack also argues that "Congress should be permitted to regulate an interstate compact as it sees fit under the Compact Clause." Opp. at 22. True enough. Congress does have authority to attach conditions when it consents to an interstate compact. *See Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 279 (1959). For example, Section 80 of the WMATA Compact partially waives WMATA's immunity. *See Morris*, 781 F.2d at 221. Ms. Slack generally alleges that Congress can regulate WMATA under the Compact Clause, but she identifies no relevant condition in the WMATA Compact.

immunity, but she insists that it does not extend to "false allegations of criminal conduct." Opp. at 29.

Ms. Slack has not alleged that Ms. Mewborn acted outside the scope of her official duties in issuing the written warning. By Ms. Slack's own account, all actions she challenges related directly to her job performance. They are at the core of Ms. Mewborn's official responsibilities as Ms. Slack's supervisor.

"To be sure, not all intentional or malicious torts committed in the normal course of employment necessarily fall within the scope of official duties." *Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1289 (D.D.C. 1997). And absolute immunity is lost when a supervisor uses manifestly excessive means to conduct official duties. *See McKinney v. Whitfield*, 736 F.2d 766, 771 (D.C. Cir. 1984). For instance, a supervisor who uses physical force to compel the obedience of his subordinates or "false threats of criminal charges to coerce an employee into resigning" may exceed the scope of his official duties. *See Beebe*, 129 F.3d at 1289. But there is no evidence that Ms. Mewborn's actions came close to these extremes.[6] Even according to Ms. Slack, Ms. Mewborn was simply wrong when she said that Ms. Slack accessed confidential information about her co-worker's salary. There is no evidence of manifestly excessive means. So Ms. Mewborn enjoys immunity from Ms. Slack's defamation claim.

In the alternative, Ms. Mewborn's statement is also protected by the qualified privilege of consent. In the District of Columbia, a publication is privileged if: "(1) there was either express

---

[6] Even if it would be a crime for Ms. Slack to access the confidential information at issue, there is no evidence that Ms. Mewborn *threatened* Ms. Slack with criminal charges over this conduct. What's more, there is no evidence that Ms. Mewborn tried to use this allegation to coerce her resignation. *Cf. Bishop v. Tice*, 622 F.2d 349, 359 (8th Cir. 1980) (holding that an official used "means beyond" his authority "by threatening [the plaintiff] with criminal charges instead of attempting to dismiss him for cause").

14

or implied consent to the publication; (2) the statements were relevant to the purpose for which consent was given; and, (3) the publication of those statements was limited to those with a legitimate interest in their content." *Marsh v. Hollander*, 339 F. Supp. 2d 1, 11 (D.D.C. 2004).

Ms. Mewborn argues that Ms. Slack consented to the publication of her statement. Defs.' Mot. at 17–18. But Ms. Slack believes that such a defense does not apply because there was no agreement between Ms. Slack and WMATA showing consent. Opp. at 28. Moreover, Ms. Slack asserts that a consent defense exists only "in the absence of malice," and a jury could find that Mewborn acted with malice given the seriousness of her allegations. *Id.*

First, in the employer-employee context, the D.C. Court of Appeals has found that consent to publication of employee performance information could be a qualified privilege even when an at-will employee never signed an agreement about the publication. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 880 (D.C. 1998). Ms. Slack is therefore mistaken: even absent a written agreement, the Court may find implied consent to publication. *See id.*

"In order to overcome the privilege [of consent], it is 'incumbent on the party complaining to show malice.'" *Id.* at 879 (quoting *White v. Nicholls*, 44 U.S. 266, 287 (1845)). "Before the inference of express malice can be indulged, the publication must, in comment, be so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that defendant was actuated by express malice." *Id.* at 879 n.9. And if the communication is privileged, a defendant "will be presumed to have been actuated by pure motives in its publication." *Id.* (quotations omitted).

Ms. Slack insists that a jury could find Ms. Mewborn "acted with malice given the seriousness of her baseless allegations of misconduct." Opp. at 35. Not so. To reiterate, Ms.

Mewborn issued a written warning that said "[y]our lack of confidentiality has put our team and information at risk. During a routine request of information, you took the salaries of your peers and used that information for your personal use (requesting a promotion based on your peer's salary, and questioning his performance)." "Poor Performance and Conduct – Written Warning" at 1. Ms. Mewborn did not accuse Ms. Slack of a crime. Ms. Mewborn's comment, contextualized in a list of several serious concerns about Ms. Slack's job performance, is not "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion" than that Ms. Mewborn was motivated by malice. *Wallace*, 715 A.2d at 879 n.9 (quotations omitted). In fact, Ms. Mewborn took out the reference to Ms. Slack's alleged use of confidential information after she learned that Ms. Slack may not have used confidential information. *See* "Unsatisfactory Performance" at 1. Given that the Court must presume that Ms. Mewborn was "actuated by pure motives," no reasonable jury could find that Ms. Mewborn acted with malice. *See Wallace*, 715 A.2d 873 at 879.

The Court will thus grant summary judgment on Count II to Ms. Mewborn.

## IV. CONCLUSION

For these reasons, the Defendants' Motion for Summary Judgment will be granted as to Count II and denied as to Count IV. The Court will dismiss Count V for a lack of jurisdiction. A separate order will issue.


Dated: January 11, 2019					TREVOR N. McFADDEN, U.S.D.J.